IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN COPFER, | ) | CASE NO. 1:13CV2279 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Brian Copfer ("Copfer") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 16.

For the reasons stated below, the Commissioner's decision is **AFFIRMED**.

**I. Procedural History**

Copfer filed an application for DIB on March 4, 2011, alleging a disability onset date of February 9, 2009.  Tr. 79, 147-153.  His insured status for collecting DIB expired on June 30, 2014.  Tr. 215.  Copfer alleged disability based on the following: bipolar, anxiety, depression, tumor in left leg, lymphedema and cellulitis in legs, learning disability and attention deficit and hyperactivity disorder.  Tr. 219.  After denials by the state agency initially (Tr. 98-101) and on reconsideration (Tr. 108-110), Copfer requested an administrative hearing.  Tr. 115-116.  A hearing was held before Administrative Law Judge George D. Roscoe ("ALJ") on March 7,

1

2012.  Tr. 11-49.  In his April 10, 2012, decision (Tr. 79-89), the ALJ determined that there are

jobs that exist in significant numbers in the national economy that Copfer can perform, i.e., he is

not disabled.  Tr. 88.  Copfer requested review of the ALJ's decision by the Appeals Council (Tr.

9) and, on August 26, 2013, the Appeals Council denied review, making the ALJ's decision the

final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.  Personal and Vocational Evidence

Copfer was born in 1961 and was 47 years old on the alleged onset date and 51 years old

on the date of the hearing.  Tr. 88.  He has at least a high school education and is able to

communicate in English.  Tr. 45.  His past relevant work includes work as a coil winder and

production worker.  Tr. 43-44, 221.

### B.  Medical Evidence

#### 1.  Physical Evidence

**Left Leg Lymphedema**: In February 2007, Copfer underwent surgery to remove a

cancerous growth from his left leg.  Tr. 20, 369.

On May 27, 2008, Copfer saw Dr. Karl J. Mooyoung, M.D.  Tr. 417-418.  Copfer

complained that his left leg was swollen.  Tr. 418.  He reported that at work he stood all day.  Tr.

418.  Copfer asked Dr. Mooyoung to fill out Family Medical Leave Act ("FMLA") forms on his

behalf because he anticipated needing two to three days off per month and having to leave work

early.  Tr. 418.  Dr. Mooyoung observed left leg swelling and advised Copfer to send him FMLA

forms.  Tr. 418.

On August 8, 2008, Copfer underwent an MRI of his left femur.  Tr. 498.  The MRI

showed mild to moderate signal abnormalities in the surgical bed.  Tr. 498.

On October 15, 2008, Copfer presented to the emergency department at Kaiser Permanente.  Tr. 463.  He underwent duplex venous imaging of his left leg, which showed mild to moderate diffuse subcutaneous edema.  Tr. 463.  His vessels were normal, with good flow and compressibility.  Tr. 463.  There was no evidence of deep vein thrombosis.  Tr. 463.

On October 16, 2008, a Thursday, Copfer saw Dr. Heather S. Mullen, M.D., for follow up treatment.  Tr. 401-404.  Dr. Mullen diagnosed cellulitis and advised that Copfer could return to work Monday.  Tr. 404.

On October 22, 2008, Copfer saw Dr. Carol Dsouza, M.D.  Tr. 397.  Copfer reported that he was 50% better and had returned to work winding coils for ten hours during the night shift.  Tr. 397.  Dr. Dsouza diagnosed hyperlipidemia and cellulitis.  Tr. 398.   On November 11, 2014, Copfer saw Dr. Dsouza again, complaining that his leg was red and painful.  Tr. 392.

On December 15, 2008, Copfer saw Dr. Bernard J. Owens, M.D.  Tr. 389-391.  Dr. Owens observed moderate swelling in Copfer's left leg.  Tr. 390.   The color, pulse, and capillary refill in the leg were normal.  Tr. 390.  Copfer reported that his leg swelling and pain made it difficult for him to stand for long periods of time and caused him to leave work early.  Tr. 390.  Dr. Owens advised Copfer to consider changing his career.  Tr. 390.

On January 25, 2009, Copfer presented to the emergency department complaining of pain and redness in his left thigh.  Tr. 380.  He was hospitalized overnight for cellulitis of his left leg and a bacterial infection.  Tr. 374.  He underwent a doppler study of his leg showing focal cellulitis versus edema of the subcutaneous soft tissue of his mid-calf and no evidence of deep vein thrombosis.  Tr. 461.

On February 10, 2009, Copfer saw Dr. Robert J. Dobrinich, M.D.  Tr. 369.  Upon physical examination, Dr. Dobrinich found 2+ pitted edema.  Tr. 369.  He diagnosed cellulitis; sarcoma, dermatofibrosarcoma protuberans; and bacteremia.  Tr. 369.

On March 17, 2009, Copfer saw Kiran Anna, M.D.  Tr. 489-491.  Dr. Anna noted that Copfer had a history of cellulitis but that there was no evidence of a current infection.  Tr. 489. Dr. Anna observed that Copfer had no gait problems, weakness, numbness or burning pain.  Tr. 490.  He had no cyanosis, clubbing or lymphadenopathy and he moved all limbs without difficulty.  Tr. 491.

On March 26, 2009, Copfer saw Sharon Sanborn Wagamon, M.D.  Tr. 496-497.  Copfer reported that his left leg was stiff on certain days, especially in cold and damp weather, but that he did not have pain or functional loss.  Tr. 496.  He complained of numbness in the inner aspect of his leg.  Tr. 496.  Copfer stated that he had trouble standing more than ten hours a day.  Tr. 496.  Dr. Wagamon noted that Copfer's records revealed that he had recurring cellulitis infections on a monthly basis beginning in October 2008 through January 2009, including a strep infection on the last occasion.  Tr. 496.  Upon physical examination, Dr. Wagamon observed lower left leg edema, mild erythema and slightly increased warmth but no frank cellulitis.  Tr. 497.  Copfer's left leg 15 centimeters below the knee measured 6.5 centimeters larger than his right leg. Tr. 497.  Dr. Wagamon advised Copfer to continue using a pump for his lymphedema. Tr. 497.  Dr. Wagamon's treatment note indicates that Copfer had been non-compliant with wearing compression stockings to treat his lymphedema.  Tr. 498.

On April 4, 2009, Copfer presented to the Metro Health Medical Center Emergency Department complaining of fever, warmth, redness and pain in his left thigh.  Tr. 502.  He reported that he irregularly used a pump and compression stockings for his lymphedema.  Tr.

502, 505.  He was treated with IV antibiotics which improved his cellulitis.  Tr. 502.  A venous

doppler study of Copfer's left leg performed on April 6, 2009, was unremarkable.  Tr. 960-61.

On April 10, 2009, Copfer saw Dr. Grace Sun for a follow up visit.  Tr. 504.  Copfer

reported that, overall, he felt back to his usual state of health.  Tr. 404.  Upon physical

examination, Copfer had 1-2+ pitting edema with erythema and increased warmth in his left leg.

Tr. 504.  He had full muscle strength and his sensation was intact.  Tr. 505.  Dr. Sun advised

Copfer to wear compression stockings at all times and to use his leg pump.  Tr. 505.

On May 6, 2009, Copfer began physical therapy at Metro Health Medical Center.  Tr.

488, 509-512.  Copfer reported that he had recurrent cellulitis and that he tried to use a pump for

one to two hours daily since January 2009.  Tr. 509.  Copfer complained that his leg pain

"worsens with a lot of activity like standing, rain, sitting too long."  Tr. 510.  Upon physical

examination, Barbara Tingley, MS, MPT, observed muscle atrophy in Copfer's medial/anterior

thigh, 2+ pitting edema in his left ankle, 4/5 strength in his left knee extension, bilateral knee

range of motion within normal limits, "Ankle Dorsiflexion Left AROM 0 degrees, Right AROM

10 degrees," and no sensation to light touch along the incisional line on Copfer's thigh from his

2007 surgery.  Tr. 510-511.  Tingley's assessment concluded that Copfer had severe left lower

leg lymphedema with an 8 to 10 centimeter circumferential difference between the left and right

leg in some areas.  Tr. 511.  She recommended physical therapy for lymphedema management,

noting that the prognosis was good if Copfer adheres to a program at home, including exercise,

self-massage, wrapping his leg, and using his leg pump.  Tr. 511.  Physical therapy notes from

May 2009 and June 2009 indicate that Copfer's leg improved with the sessions although he still

had some swelling in his left leg.  Tr. 518, 521, 529-530, 534-535.

On May 22, 2009, Copfer saw Dr. Anna for a follow up appointment.  Tr. 523-526. Copfer reported no acute issues.  Tr. 523.  Dr. Anna observed that Copfer was not in distress and had no cyanosis, clubbing, or lymphadenopathy.  Tr. 525.  He had minimal swelling of his left leg and moved all limbs with no gross focal neurological deficits.  Tr. 525.

On April 23, 2010, Copfer saw Paul Cisarik, M.D., as a follow up to Copfer's weight management clinic.  Tr. 899-901.  Dr. Cisarik observed that Copfer had no lower extremity edema.  Tr. 900.

On March 24, 2011, Copfer saw Dr. Anna and complained of problems sleeping.  Tr. 667-669.  Dr. Anna listed Copfer's lymphedema in his leg as "stable."  Tr. 669.  On May 26, 2011, Copfer had mild edema in his left leg.  Tr. 987.  His gait was normal, his reflexes were normal and symmetric, his sensation was intact and he had no motor deficits.  Tr. 987.

On May 25, 2011, Copfer underwent a CT scan of his left leg.  Tr. 993-994.  The scan revealed scar tissue without tumor recurrence.  Tr. 993-994.

On July 15, 2011, Copfer saw Diana Pi, M.D.  Tr. 1032-1033.  Dr. Pi observed that Copfer had no lower extremity edema or cyanosis and had full muscle strength.  Tr. 1033.  She commented that Copfer was wearing a compression stocking on his left leg and that he had a long, well healed scar.  Tr. 1033.

On October 3, 2011, Copfer saw Dr. Michael Lewis, M.D.  Tr. 1153-1154.  Dr. Lewis observed no lower extremity edema or cyanosis and full muscle strength.  Tr. 1154.

**Obstructive Sleep Apnea**:  On March 24, 2011, Copfer complained to Dr. Anna that he was talking in his sleep and that he did not feel well rested in the morning.  Tr. 667.  Copfer also reported that he snored.  Tr. 667.  Dr. Anna referred Copfer to a sleep study, and on June 12, 2011, Copfer saw Joseph Golish, M.D.  Tr. 667, 972-975.  The sleep study performed by Dr.

Golish showed that Copfer had moderate to severe obstructive sleep apnea syndrome. Tr. 972-73. Dr. Golish recommended that Copfer wear a nasal continuous positive airway pressure (CPAP) device while sleeping. Tr. 974- 975. Dr. Golish also advised that, until Copfer's symptoms are controlled, Copfer should use caution driving and operating heavy machinery and that he should avoid situations in which he could place himself or others at risk due to drowsiness or lack of alertness. Tr. 974.

On October 3, 2011, Copfer reported that the CPAP device helped him sleep at night. Tr. 1148. On January 4, 2012, Copfer again reported that he was wearing the CPAP device and that he was sleeping well. Tr. 1163-1164.

### 2. Mental Evidence

On June 24, 2008, Copfer saw Lise Moulton, LISW. Tr. 356-359. Copfer complained of stress, anger and relationship problems. Tr. 356. Upon mental status examination, Copfer was unkempt, overweight and highly self-conscious. Tr. 358. He was awkward in conversation, his speech was adequate and "a bit pressured" and his thought process intact. Tr. 358. Copfer's memory was fair to adequate, his cognitive functioning was within normal limits, he had average to low intellectual functioning and his insight and judgment were fair. Tr. 358. Moulton diagnosed Copfer with attention deficit hyperactivity disorder (ADHD) and adjustment disorder. Tr. 357. She assessed a global assessment of functioning (GAF) score of 68.[1] Tr. 358.

On March 19, 2009, Copfer saw Dr. Anna for a refill of amphetamines, which he was prescribed for his ADHD in June 2008. Tr. 489. Copfer reported that he was eating and

---

[1] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

sleeping well, exercising, and did not feel depressed.  Tr. 489.  Copfer's Adderall prescription

was refilled for one month until he was able to see a psychiatrist.[2]  Tr. 492.

On July 10, 2009, Copfer saw Michael Tran, M.D.  Tr. 782-785.  Upon mental status

examination, Tran observed that Copfer was cooperative and restless.  His affect was dramatic

and his speech was appropriate, rapid and pressured.  Tr. 784.  His thought process was logical

with circumstantial association.  Tr. 784.  He was oriented to time, person and place, and his

memory and attention were sustained.  Tr. 784.  Dr. Tran diagnosed Copfer with bipolar disorder

and anxiety.  Tr. 784.  He commented that Copfer had "some symptoms of mania including

hypertalkative and pressured speech, lou[]d, and mild euphoria.  It is likely that he has untreated

bipolar which may be aggravated by starting Adderall."  Tr. 784.  Dr. Tran assessed a GAF of

41-50.[3]  Tr. 784.  He discontinued Copfer's Adderall, started him on Depakote and continued

Celexa.[4]  Tr. 784.

On August 10, 2009, Copfer reported to Dr. Tran that he was doing better on the

Depakote but that he had difficulty concentrating and paying attention.  Tr. 779.  He also

complained that he still had mood swings.  Tr. 779.  Copfer stated that he was worried about his

financial situation and whether he would get unemployment benefits.  Tr. 779-780.

On October 19, 2009 and November 22, 2009, Dr. Tran observed that Copfer was: calm,

cooperative, and friendly; his speech was coherent with a normal rate of flow; his affect

appropriately reactive; his thought processes were logical and organized; his association tight;

---

[2]  Adderall is an amphetamine used to treat ADHD.  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 26.

[3]  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  DSM-IV-TR at 34.

[4]  Depakote is used to treat manic episodes associated with bipolar disorder.  *See* Dorlands, at 490, 538.  Celexa is an antidepressant.  *Id*. at 312, 366.

his recent and remote memories were good; his attention span and concentration were sustained; and his insight and judgment were fair.  Tr. 771, 774.  Dr. Tran characterized Copfer as "stable." Tr. 772, 774.

On January 14, 2010, Copfer reported that he was more depressed and anxious.  Tr. 760. Dr. Tran observed that Copfer was: calm, cooperative, and friendly; his thought processes were logical and organized; his association tight; his recent and remote memories were good; his attention span and concentration were sustained; and his insight and judgment were fair.  Tr. 760-761.  Dr. Tran again characterized Copfer as "stable."  Tr. 761.

On February 25, 2010, Copfer reported that he was "a little on edge because his lease will run out."  Tr. 753.  Dr. Tran observed that Copfer was: calm, cooperative, and friendly; his speech was pressured and rapid; his thought processes were logical and organized; his association tight; his recent and remote memories were good; his attention span and concentration were sustained; his insight and judgment were fair; and his mood was anxious.  Tr. 754.  Dr. Tran characterized Copfer as "stable."  Tr. 754.  Dr. Cisarik's notes from office visits for Copfer's weight management clinic on March 23, 2010, and April 30, 2010, also documented that Copfer's mood was stable.  Tr. 899, 902.

On April 8, 2010, Copfer reported that his medications were working "good."  Tr. 742. Dr. Tran observed that Copfer was: cooperative and appropriate; his speech was loud and garrulous; his thought process was circumstantial; his recent and remote memories were good; his attention span and concentration were sustained; his insight and judgment were fair; and his mood was anxious.  Tr. 743.

On June 24, 2010, Copfer began group therapy counseling sessions that met weekly with James M. Yokley, Ph.D.  Tr. 673.  Treatment notes indicate that Copfer participated "to address

issues related to his mood disturbance and associated risk for psych hospitalization."  Tr. 707.

Copfer occasionally reported a positive mood rating (Tr. 708 (8 out of 10), 714 (same), 722

(same)) and occasionally reported a poor mood rating (Tr. 1215, (0 out of 10), 700 (5 out of 10),

703 (3 out of 10)).

On July 1, 2010, Dr. Tran referred Copfer to Fernando Espi, M.D.  Tr. 677.  Dr. Tran

explained that Copfer had "major improvement in his manic symptoms" after starting medication

and assessed a GAF score of 70.  Tr. 677.   Dr. Tran opined that Copfer's symptoms were more

consistent with bipolar disorder rather than ADHD.  Tr. 677.  He commented that Copfer still

had some residual symptoms, had difficulty understanding psychological education, and

"probably has borderline IQ."  Tr. 677.

On August 16, 2010, Copfer saw Dr. Espi.  Tr. 718-720.  Copfer reported that he was

"feeling pretty good."  Tr. 719.  Copfer's unemployment benefits had been extended and he was

looking for work.  Tr. 719.  Upon mental examination, Copfer was cooperative; his speech was

loud and garrulous, his thought process circumstantial and his mood anxious.  Tr. 719.  His

attention and concentration were sustained and his recent and remote memories were within

normal limits.  Tr. 719.  Dr. Espi diagnosed him with bipolar disorder.  Tr. 719.

On August 31, 2010, Dr. Espi observed that Copfer was stable, smiled and had a sense of

humor.  Tr. 715-716.   Copfer's mental status examination assessment was the same as his

previous visit.  Tr. 715-716.  It remained unchanged on November 22, 2010; December 22, 2010;

and January 14, 2011.  Tr. 688, 690, 694-695.

On March 22, 2011, Copfer complained to Dr. Espi that he was having problems with

concentration and attention.  Tr. 662.  Copfer explained that his friend commented that Copfer

was unable to remember stories she told him.  Tr. 662.  Copfer requested Adderall, which he had

been prescribed in the past.  Tr. 662.  Upon mental examination, Copfer was cooperative, his mood was anxious, and he had a full affect and smiled.  Tr. 662.  His speech was loud and garrulous, his thought processes circumstantial, his attention and concentration were sustained, and his recent and remote memories were within normal limits.  Tr. 662.  Dr. Espi again diagnosed bipolar disorder and continued Copfer's medication.  Tr. 663.  On March 24, 2011, Copfer saw Dr. Anna and reported that he did not feel depressed.  Tr. 667.

On June 3, 2011, Copfer informed Dr. Espi that his application for disability benefits was denied.  Tr. 981.  Copfer stated that he might look for a part time job but that he did not want to damage his case for disability.  Tr. 981.  He reported that his pain was stable.  Tr. 981.  Upon mental examination, Copfer was cooperative and his speech was normal.  Tr. 981-82.  His attention and concentration and were sustained and his recent and remote memories were normal.  Tr. 982.

On July 14, 2011, Copfer reported to Dr. Espi that "he is better now."  Tr. 1035.  Dr. Espi observed that Copfer was smiling and in better spirits.  Tr. 1035.  During a visit with Dr. Pi, on July 15, 2011, Copfer reported that his mental health symptoms were well-controlled.  Tr. 1032.

On September 15, 2011, Copfer informed Dr. Espi that he was feeling fine, that things were stable, and that he needed to be on disability because he is unable to work.  Tr. 1140.  Dr. Espi commented, "Copfer had been doing ok.  Says he has a v[e]ry severe learning disability and won't be able to work."  Tr. 1140.  Dr. Espi noted that Copfer's vocational assessment indicated that Copfer's reading is at a third grade level and his spelling and arithmetic are at a second grade level.  Tr. 1140.  He observed that Copfer's "lawyer told him that if he works he will mess up the disability case."  Tr. 1140.  Copfer reported that he feels on top of the world for three days

and then crashes.  Tr. 1141.  Dr. Espi determined that, clinically, Copfer seemed stable.  Tr. 1141.  He encouraged Copfer to find a job.  Tr. 1141.

On February 2, 2012, Dr. Espi observed that Copfer was smiling and had a positive attitude.  Tr. 1192.  Dr. Espi noted that Copfer was cooperative and had normal speech; he had a full range of affect; his thought processes were logical and organized; his attention and concentration were sustained; and his recent and remote memories were within normal limits.  Tr. 1192-93.  Copfer could not perform serial sevens or remember the previous president, but he could remember four out of five words after two minutes, spell "world" backwards and write a sentence.  Tr. 1192.  Dr. Espi continued Copfer's medication.  Tr. 1193.

On June 13, 2012, Dr. Espi transferred Copfer to Raman Marwaha, M.D.  Tr. 1232.  In the summary of Copfer's case, Dr. Espi explained that Copfer had previously been diagnosed with bipolar disorder but that Dr. Espi had never seen a full manic or hypomanic episode.  Tr. 1232.  Dr. Espi commented that Copfer got irritable and frustrated at times.  Tr. 1232.  Dr. Espi diagnosed Copfer with an anxiety disorder and a general mood disorder.  Tr. 1232.

On July 20, 2012, Copfer saw Dr. Marwaha.  Tr. 1236.  Copfer reported that he was feeling okay but tired.  Tr. 1236.  He complained that he worries and suffers from anxiety.  Tr. 1236.  Upon mental examination, Copfer was cooperative, his speech was normal and his thought process was logical and organized.  Tr. 1238.  His mood was anxious, his affect full, his attention and concentration sustained and his recent and remote memories were within normal limits.  Tr. 1237.  Dr. Marwaha maintained Dr. Tran's diagnosis and treatment plan.  Tr. 1238.

On September 7, 2012, Copfer informed Dr. Marwaha that he was feeling "down" because of financial problems.  Tr. 1255.  Copfer complained that he was feeling depressed, hopeless and helpless, had a poor appetite and slept badly.  Tr. 1255.  Copfer's mental status

examination assessment remained the same as his previous visit.  Tr. 1255.  Dr. Marwaha

increased the dosage of paroxetine and continued Copfer's other medications.[5]  Tr. 1256.  He

also recommended that Copfer attend group therapy with Dr. Yokley.  Tr. 1257.

### B.  Vocational Evidence

On June 4, 2009, Copfer saw Mary Pettit-Frisina, a vocational counselor at Metro Health

Medical Center.  Tr. 532.   Copfer reported that he had leg swelling that limited his ability to

constantly walk and stand, problems with reading and math, and that he had depression and

ADHD.  Tr. 532.  Pettit-Frisina referred him to the Bureau of Vocational Rehabilitation for job

placement and possible retraining. Tr. 532.

On February 15-19, 2010, Sara Drewlo from Vocational Guidance Services tested

Copfer's job skills.  Tr. 178-185.  She noted that Copfer requested that she complete his history

form because he was not able to read and write answers independently.  Tr. 178.  Drewlo

observed that Copfer became easily frustrated with certain tasks but that he never communicated

that he was frustrated and he did not stop the task.  Tr. 181.  Copfer showed strength in

"attendance, punctuality, attending to task, quality, showing initiative, and relating to others."

Tr. 182.  Drewlo concluded that Copfer's general learning ability, verbal ability and numerical

ability were below competitive levels.  Tr. 181.  She also indicated that Copfer may need extra

direction in learning new tasks and following written instructions.  Tr. 181.  He scored "below

average" on reading comprehension, total reading ability, spelling, and arithmetic.  Tr. 179.  His

scores ranged from Grade 1.9 in arithmetic to Grade 8.8 in vocabulary.[6]  Tr. 179.

Copfer's spatial and clerical perception scores were also below average.  Tr. 180.

However, his overall work speed placed him at the competitive level of employment and his

---

[5]  Paroxetine is used to treat anxiety disorders.  *See* Dorlands, at 1384.

[6]  Vocational Guidance Services considers eighth grade to be average.  Tr. 180.

overall work accuracy placed him at the highly competitive level.  Tr. 180.  Drewlo recommended that, based on the above, Copfer explore the possibility of tow motor work, building maintenance and custodial/housekeeping.  Tr. 184.  She also commented that Copfer may consider applying for Social Security Disability.  Tr. 184.

On April 1, 2010, Copfer met with vocational counselor D. Volak.  Tr. 265.  On April 6, 2010, Volak observed that Copfer had "substantial difficulty staying focused and providing brief and concise answers" to mock interview questions but, on April 9, 2010, after studying the material, Copfer "performed much better."  Tr. 265.  Volak completed or helped Copfer complete job applications and followed up with potential jobs on Copfer's behalf. Tr. 269-271.  On July 22, 2010, Copfer failed to attend an orientation with a prospective employer because he knew that he would need a day off in August and he did not want to have to call off work on that day.  Tr. 720.  Copfer requested that his case be put on hold until after that date and stated that he was awaiting a decision on his unemployment benefits.  Tr. 270.

Beginning on December 5, 2010, Copfer was placed in a two-week accommodated work trial at Advance Auto, working six hours per day.  Tr. 167.  His employer observed that he had problems bending down to the lower shelves in the store but that he met all expectations and standards.  Tr. 276.  Copfer's vocational supervisor noted that Copfer had moderate issues with attention to tasks and that he needed some prompting.  Tr. 168.

Copfer reported that his legs and back hurt after the second day of work.  Tr. 277.  He requested termination of the placement "due to his lymphademia."  Tr. 277.  He informed the vocational counselor that he needed a job in which he can sit and stand as needed.  Tr. 198.  In early 2011, Copfer requested that his case be closed because he decided to pursue disability.  Tr.

281.  He informed vocational services that he would like to find a part time job if he is awarded disability benefits.  Tr. 281.

On August 30, 2011, upon referral from Dr. Espi, Copfer saw vocational counselor Peter Frey, LPC, CRC.  Tr. 1132.  Copfer tested at a third grade level in reading and his spelling and arithmetic tested at a second grade level.  Tr. 1137.  He tested below the eighth percentile in dexterity. Tr. 1137.  On September 20, 2011, Copfer informed Frey that he did not want to continue with vocational services because his lawyer told him he should not work while pursuing disability.  Tr. 1144.  Copfer again advised that he may wish to pursue part time employment once his disability is approved.  Tr. 1144.

### C.  Medical Opinion Evidence

#### 1.  Treating Source

On December 1, 2009, Dr. Tran completed a one-page disability documentation form for the Ohio Rehabilitation Services Commission.  Tr. 318.  He indicated that Copfer was diagnosed with bipolar disorder, anxiety and learning disability.  Tr. 318.  Dr. Tran opined that Copfer has no work restrictions, that his prognosis for employment is poor and that his disability is permanent.  Tr. 318.   Dr. Tran wrote, "[d]ue to his disability he is unable to find work."  Tr. 318.

#### 2.  State Agency Opinions

On May 10, 2011, Lynne Torello, M.D., a state agency physician, reviewed Copfer's medical record.  Tr. 54-60.  Regarding Copfer's physical Residual Functional Capacity ("RFC"), Dr. Torello opined that Copfer could perform light work and could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for six hours in an eight hour workday; sit for six hours in an eight hour workday; frequently stoop; occasionally climb ramps and stairs

but never ladders, ropes or scaffolds; and could occasionally balance, kneel, crouch and crawl. Tr. 56-57.  On September 17, 2011, W. Jerry McCloud, M.D., a state agency physician, reviewed Copfer's updated record and, other than finding Copfer's ability to balance unlimited, affirmed Dr. Torello's findings. Tr. 68-70.

On May 13, 2011, Karla Voyten, Ph.D., a state agency psychologist, reviewed Copfer's medical record.  Tr.56-58.  Regarding Copfer's mental RFC, Dr. Voyten opined that Copfer was moderately limited in his ability to: carry out detailed instructions; perform activities within a schedule,  maintain regular attendance and be punctual within customary tolerances; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 58.  Dr.  Voyten found that Copfer was capable of performing moderately complex tasks with three to four steps.  Tr. 58.

On September 13, 2011, Todd Finnerty, Psy.D., a state agency psychologist, reviewed Copfer's updated record and affirmed Dr. Voyten's findings.  Tr. 70-72.  Dr. Finnerty also found that Copfer was moderately limited in his ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting.  Tr. 71-72.  Dr. Finnerty found that Copfer can interact with others superficially and adapt to settings without frequent changes.  Tr. 71-72.

### D.  Testimonial Evidence

### 1. Copfer's Testimony

Copfer was represented by counsel and testified at the administrative hearing.  Tr. 26-48. He testified that he lives in an apartment with his wife.  Tr. 16, 29-20.  He is able to drive and

sometimes drives his wife to work.  Tr. 30.  When he was in high school, Copfer was in special education classes.  Tr. 17.  He stated that he can do a little bit of addition and subtraction but is unable to multiply and divide.  Tr. 17.

Copfer testified that his last job was as a coil winder.  Tr. 18.  He worked the night shift and had to stand for ten hours a night.  Tr. 18-19, 35.  He worked for just under five years and was laid off at the same time of his alleged onset date, February 9, 2009.  Tr. 18-19.  He testified that he struggled with the standing requirement at work and that he had to take FMLA leave to avoid being fired.  Tr. 35.  He left work early three or four times a month and called off three or four times a month because of leg pain.  Tr. 36-37.  He also previously worked as an assembler for a lawnmower company and held temporary jobs as a grinder, general laborer and stock person.  Tr. 19.

Copfer testified that he was prevented from working because he has "lipedema" in his leg making it very hard for him to stand and sit.  Tr. 19.  He stated that he had surgery on his left leg to remove a cancerous growth in 2007 and that he has had a hard time with the leg since then. Tr. 20.  His leg causes pain but does not take medication for it.  Tr. 20.  Instead, he uses a lymphedema pump for an hour before he goes to bed and he wears compression stockings.  Tr. 20.  He also stacks pillows on his bed at night to elevate his foot "to keep the fluid moving."  Tr. 21.  Copfer stated that the compression stocking helps a "little bit."  Tr. 25.

Copfer testified that he used to have cellulitis attacks in his leg when he was working at his standing job.  Tr. 23.  He stated that he would go to the hospital because he would get infections in his leg, but that the infections stopped since he has not been working.  Tr. 23.  He was going to physical therapy during that time but has stopped going.  Tr. 22.  Copfer testified that he can walk, sit and stand for about fifteen or twenty minutes.  Tr. 25.  He cannot bend,

17

stoop or squat.  Tr. 35.  He avoids stairs because sometimes his left leg buckles when he walks.  Tr. 34.  He can lift about fifty pounds. Tr. 26.

Copfer also stated that he has problems with his memory.  Tr. 26.  He is unable to remember something that a friend told him the previous week.  Tr. 26.  He watches some television and can usually follow the programs that he watches.  Tr. 26.  He gets anxiety when he is around crowds of people or in new situations.  Tr. 27.  He has difficulty learning new things.  Tr. 38.  He does not handle stress, frustration or changes well and has trouble paying attention or staying focused if he is not interested.  Tr. 41.

Copfer testified that he is able to groom himself and that he cooks for himself and his wife.  Tr. 29.  He puts the dishes in the dishwasher, vacuums and dusts.  Tr. 33.  He does laundry in the basement of the apartment and uses the elevator.  Tr. 33-34.  He sleeps well with his CPAP machine.  Tr. 29.  He has a close friend who calls him every day to check up on him.  Tr. 35.

### 2.  Vocational Expert's Testimony

 Vocational Expert Ted Macy ("VE") testified at the hearing.  Tr. 41-47.  The ALJ discussed with the VE Copfer's past relevant work as a coil and production worker.  Tr. 43-44.  The ALJ asked the VE to determine whether a hypothetical individual of Copfer's age, education and past relevant work experience could perform any of the jobs he performed in the past if that person had the following characteristics: a capacity for light work, who can perform only simple reading, writing, and arithmetic, who cannot climb ladders, ropes and scaffolds but can occasionally climb ramps and stairs and can occasionally stoop, kneel, crouch and crawl, can perform simple, routine tasks in a work setting without frequent changes or fast-paced requirements and can only have superficial social interactions.  Tr. 44.  The VE testified that the person could not perform Copfer's past relevant work as a coil winder and production worker.

18

Tr. 44.  The ALJ asked the VE if there are other jobs that the person could perform, and the VE testified that the person could perform jobs as a wire worker (105.000 national jobs, 750 northeast Ohio jobs), electronics worker (60,000 national jobs, 450 northeast Ohio jobs), and bench assembler (110,000 national jobs, 800 northeast Ohio jobs).  Tr. 45.

Next, the ALJ asked the VE to determine whether there was any work that the same hypothetical individual could perform if that individual would be off task at least twenty percent of the time.  Tr. 46.  The VE answered that there were no jobs that such an individual would be able to perform without special accommodations. Tr. 46.

Copfer's attorney asked the VE to consider a hypothetical individual with the characteristics previously described by the ALJ but who can work only at the sedentary level of exertion, limited to standing only two hours a day, in a low-stress environment meaning no fast-paced or production requirements that would be over half the competitive level, who can have minimal and superficial interaction with others including coworkers and supervisors, who can handle only minimal changes with all changes explained, and have extra supervision available to re-demonstrate how to do the job whenever those changes would be in place and initially for the job to be started.  Tr. 46-47.  The VE answered that there are no jobs for such an individual.  Tr. 47.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[7] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

---

[7] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his April 10, 2012, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2014.  Tr. 81.

2. The claimant has not engaged in substantial gainful activity since February 9, 2009, the alleged onset date.  Tr. 81.

3. The claimant has the severe impairments of bipolar disorder, lymphedema of the left lower extremity, and history of attention deficit hyperactivity disorder.  Tr. 81.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Tr. 82.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §404.1567(b), except that his ability to perform a full range of light exertional work is reduced by additional nonexertional limitations. Specifically, he cannot climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can occasionally stoop, kneel, crouch, and crawl; and can perform simple routine tasks in a work setting without frequent changes or fast pace requirements, and involving only superficial social interactions.  Tr. 84.

6. The claimant is unable to perform any past relevant work.  Tr. 87.

7. The claimant was born on April 21, 1961 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently attained age 50, which is closely approaching advanced age, on April 1, 2011.  Tr. 88.

8. The claimant has at least a high school education and is able to communicate in English.  Tr. 88.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 88.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 88.

11. The claimant has not been under a disability, as defined in the Social Security Act, from February 9, 2009, through the date of this decision. Tr. 89.

## V. Parties' Arguments

Copfer objects to the ALJ's decision on two grounds. He asserts that the ALJ's decision is not supported by substantial evidence because the ALJ failed to fully evaluate Copfer's impairments under the Listings at Step Three and because the ALJ's hypothetical question to the VE was incomplete in that it was based on a faulty RFC assessment.[8]  In response, the Commissioner submits that substantial evidence supports both the ALJ's determination that Copfer's impairments did not meet the severity of a Listing and the ALJ's RFC assessment.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir.1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor

---

[8]  The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not err in his Step Three determination

At Step Three, an ALJ considers whether the claimant has an impairment that meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. §404.1520(a)(4)(iii). A claimant must meet all of the specified medical criteria to show that his impairment matches an impairment in the Listings; an impairment that manifests only some of those criteria, no matter how severely, does not qualify. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Here, the ALJ found that Copfer did not meet or equal a listed impairment. Tr. 82. The ALJ considered Listings 8.05 (Dermatitis), 12.02 (organic mental disorders) and 12.04 (affective disorders). Tr. 82. Copfer contends that the ALJ "failed to evaluate whether [] Copfer's lymphedema medically equaled Listing 1.02A or 1.03, as directed by Listing 4.00(G)(4)," and whether Copfer's learning disorder "met the listing for intellectual disabilities under Listing 12.05." Doc. 18, pp. 17-18. Copfer "requests remand for medical expert testimony to address whether his lymphedema medically equals a listed impairment, and to determine, after a consultative examination for standardized intellectual testing, whether [his] intellectual disability meets Listing 12.05." Doc. 18, p. 19.

### 1. Lymphedema

Listing 4.00(G)(4)(b) provides,

Lymphedema does not meet the requirements of 4.11, although it may medically equal the severity of that listing. We will evaluate lymphedema by considering whether the underlying cause meets or medically equals any listing or whether the lymphedema medically equals a cardiovascular listing, such as 4.11, or a musculoskeletal listing, such as 1.02A or 1.03. If no listing is met or medically equaled, we will evaluate any functional limitations imposed by your lymphedema when we assess your residual functional capacity.

20 C.F.R. Pt. 404, Subpt. P, App.1.  Listing 1.02A states,

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

*Id*.  Listing 1.03 states,

> 1.03 Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

*Id*.  Effective ambulation, defined in 1.00B2b, is as follows:

> individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id*.

Here, the ALJ stated that he considered Copfer's lymphedema and determined that there was a lack of objective findings of sufficient severity to meet or medically equal any listing.  Tr. 82.  *See* Listing 4.00(G)(4)(b) ("We will evaluate lymphedema by considering whether the underlying cause meets or medically equals any listing").  The ALJ explained that, regarding Copfer's scar tissue at his surgery site, Listing 8.05, Dermatitis, is "unsatisfied due to the absence of extensive skin lesions that persist for three months or more despite continuing prescribed treatment."  Tr. 82.  The ALJ later explained that Copfer had surgery on his left leg in

February 2007 and thereafter completed physical therapy to strengthen it.  Tr. 85, 369, 389, 488.
He noted that Copfer had leg infections requiring antibiotics in October 2008, November 2008,
December 2008, January 2009 and February 2009, and antibiotic treatment in April 2009.  Tr.
85, 368, 374, 389, 395, 400, 502.  He observed that Copfer's physician indicated, in April 2009,
that Copfer had been irregularly using his compression stocking and his lymphedema pump and
that the doctor stressed the importance of these items in reducing infections.  Tr. 85, 505-506.
The ALJ commented that Copfer's physicians instructed him to wear his compression stockings
even when he exercised, and that Copfer reported in May 2009 that he disliked wearing
compression bandages while working out.  Tr. 85, 518, 511.  The ALJ observed, "[Copfer]
experienced significantly less frequent infections after having been counseled to be more
compliant with his use of a compression stocking and a compression pump."  Tr. 85.  The ALJ
explained that computed tomography (CT) scans of Copfer's left leg indicated that Copfer has
not experienced a recurrence of his tumor.  Tr. 85, 992, 1041.  Notably, the ALJ stated, "[Copfer]
has presented throughout the record with a normal or independent gait, normal range of motion
of the knees, full strength of the lower extremities except for one occasion when his left leg was
described as having '4+/5' strength, and appropriate lower extremity function, and he has also
repeatedly denied having physical pain."  Tr. 85 (citing 471, 491, 510-511, 515, 519, 691, 771,
981, 990, 1154, 1162).  Finally, the ALJ concluded that the medical evidence shows that
Copfer's leg problems "have largely subsided through consistent treatment efforts."  Tr. 86.

Copfer does not assert, or identify evidence to support, that he meets or equals Listings
1.02A or 1.03.  Both listings pertain to a joint.  It is not clear from the record what, if any,
specific joint of Copfer's left leg is affected.[9]  Moreover, as the ALJ indicated, the record does
not indicate chronic joint pain or a chronic joint problem.  *See Zebley*, 493 U.S. at 530 (claimant

---

[9]  Copfer had surgery on his left thigh.  Tr. 498.

must meet all of the specified medical criteria to meet a listing); *Drake v. Colvin*, 2014 WL 5431322, at *10-11 (N.D. Ohio Oct. 24, 2014) (ALJ's failure to consider Listings 1.02A and 1.03 not error because evidence did not show claimant met all the specified medial criteria). Both listings also require an inability to ambulate effectively.  Copfer does not state that he is unable to ambulate effectively or that there is substantial evidence to support such a finding.  He does not argue that the ALJ inaccurately characterized the record regarding his left leg strength and gait.  The ALJ's failure to refer specifically to Listings 1.02A and 1.03 in Step Three is not error because elsewhere in his opinion the ALJ discussed substantial evidence showing that Copfer does not meet or equal Listings 1.02A or 1.03:  Copfer had an independent gait, normal range of motion in his knees, full leg strength, and he consistently denied physical pain.  *See Beldsoe v. Barnhar*, 165 Fed. App'x 408, 411 (6th Cir. 2006) (ALJ did not err when he failed to spell out every consideration that went into a Step Three analysis when the ALJ described pertinent evidence elsewhere in the decision); *Hufstetler v. Comm'r of Soc. Sec*., 2011 WL 2461339, *10 (N.D. Ohio June 17, 2011) (affirming the Commissioner's decision when the ALJ did not specifically discuss a listing at Step Three but provided sufficient analysis at Step Four for the court to determine that no reasonable fact finder would have decided the matter differently).  The ALJ also gave great weight to the state agency opinions of Drs. Torello and McCloud finding that Copfer can perform light work subject to postural limitations.  Tr. 86, 56-57, 79-70.  Accordingly, the ALJ evaluated Copfer's lymphedema by considering whether it meets or medically equals any listing and the failure of the ALJ to specifically cite Listings 1.02A or 1.03 is not error.

Copfer also argues that the ALJ should have obtained medical expert testimony to evaluate Copfer's lymphedema.  Doc. 18, p. 18.  Copfer cites 20 C.F.R. § 404.1527(e)(2)(III) in

support of his argument that an ALJ is "empower[ed]" to ask for medical expert testimony.  Doc. 18, p. 18.  20 C.F.R. § 404.1527(e)(2)(III) states that an ALJ "may also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart."  Copfer does not identify legal authority requiring an ALJ to obtain medical expert testimony and the plain language of § 404.1527(e)(2)(III) indicates otherwise.  Thus, the ALJ did not err when he did not obtain medical expert testimony to evaluate whether Copfer's lymphedema medically equals a listing.

### 2.  Intellectual disability

Copfer also asserts that the ALJ failed to consider whether his learning disability met Listing 12.05.  Doc. 18, p. 18.  The ALJ considered whether Copfer met Listing 12.02 (organic mental disorders) and Listing 12.04 (affective disorders).  Copfer argues that the ALJ erroneously considered Listing 12.02 because 12.02 "applies to individuals who experience a significant decline from previous functioning, such as loss of measured intellectual ability by at least 15 IQ points compared to premorbid functioning."  Doc. 18, p. 18.  Instead, Copfer contends, the ALJ should have considered Listing 12.05, which pertains to Intellectual disability:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

20 C.F.R. Pt. 404, Subpt. P, App.1.[10]  In order to satisfy the diagnostic description, a claimant must prove that she meets three factors: "(1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations."  *Hayes v. Comm'r of Soc. Sec.*, 357 Fed. App'x 672, 675 (6th Cir. 20*09*).  Additionally, a claimant must meet at least one of the following requirements:

---

[10]  Listing 12.05 was formerly titled "mental retardation."  *See*  78 Fed.Reg. 46,499 (August 1, 2013).

A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

B. A valid verbal, performance, or full scale IQ of 59 or less;

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App.1.

Copfer concedes that "the record does not contain school records or standardized intelligence testing," but argues that there is "significant evidence to support that Mr. Copfer has severe cognitive delays, including a history of special education classes and evidence of current reading, spelling, and mathematics abilities at the second and third grade levels as an adult." Doc. 18, p. 18.  Copfer maintains that his cognitive limitations "strongly suggests impaired functioning that would meet Listing 12.05, and standardized testing necessary for the ALJ to fully evaluate his intellectual functioning is not available in the record."  Doc. 18, pp. 18-19. Copfer requests that the Court remand his case so that a consultative examination for standardized intellectual testing may be performed.  Doc. 18, p. 19.

As an initial matter, Copfer's current reading, spelling and mathematical abilities do not demonstrate onset of an impairment before age 22, as required to meet Listing 12.05.  *See Foster v. Halter*, 279 F.3d 348, 354-355 (6th Cir. 2001) (evidence did not demonstrate onset of impairment before age 22 when none of the claimant's "testing or evaluation was

contemporaneous with her developmental period; she was already 42 years of age when the first

testing was performed[.]"); *Hayes*, 357 Fed. App'x at 677 (Listing 12.05 is not met when

claimant fails to establish onset before age twenty-two); *cf. Napier v. Comm'r of Soc. Sec.*, 2014

WL 5308581 at *4 (S.D.Ohio Oct. 16, 2014) (remanding in part because claimant's records

indicated "significant, well-documented and persistent deficits in multiple academic and social

areas" throughout her school years).  As Copfer concedes, the record does not contain his school

records.  Copfer testified that he was in special education classes; he also testified that he went as

far as the twelfth grade.  Tr. 17, 88.  He does not identify evidence in the record that indicates

that his alleged impairment began before he was twenty-two years old as required to meet

Listing 12.05.

Furthermore, Copfer does not describe which subsection in Listing 12.05 he allegedly

meets.  Nor does he identify evidence showing a deficiency in adaptive functioning or even

allege that he has a deficiency in adaptive functioning.  "The adaptive skills prong evaluates a

claimant's effectiveness in areas such as social skills, communication skills, and daily-living

skills."  *Hayes*, 357 Fed. App'x at 677 (citing *Heller v. Doe*, 509 U.S. 312, 329 (1993)).  The

ALJ observed that Copfer performs housework, prepares meals, attends to matter of self-care and

receives assistance shopping from a friend; he has a good relationship with his wife, has one

close friend and speaks regularly with family and friends; and he presents in a coherent manner

exhibiting logical thought and normal speech.  Tr. 83, 255-258.  Copfer was repeatedly found to

be well-groomed, cooperative, oriented, alert, and having full affect, fair insight and judgment.

Tr. 86.  The ALJ commented that Copfer consistently sought employment and participated in

vocational rehabilitation but stopped doing so because he was concerned that looking for

employment would hurt his disability application despite the fact that his treating psychiatrist, Dr. Espi, encouraged him to find a job.  Tr. 86, 1141, 1144.

Finally, the ALJ gave "great weight" and "moderate weight" to the state agency opinions concluding that Copfer is subject to mild or moderate functional limitations and is able to complete moderately complex tasks.  Tr. 87.  The ALJ considered the Ohio Rehabilitation Services Commission form filled out by Dr. Tran, wherein Dr. Tran stated that Copfer has bipolar disorder, anxiety and learning disability and was therefore unable to work.  Tr. 87, 318. The ALJ explained that he gave this opinion "less weight" because of the absence of supportive objective findings, Copfer's retained functional abilities and Copfer's statement "indicative of secondary gain behavior."  Tr. 87.  Substantial evidence supports the ALJ's decision and he did not err when he failed to discuss whether Copfer met Listing 12.05.

### B.  The ALJ's RFC is supported by substantial evidence

Copfer argues that the ALJ relied on an incomplete hypothetical question to the VE at the hearing that was based on an insufficient RFC finding.  Doc. 18, p. 19-20.  The regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant medical and other evidence" of record.  20 C.F.R. §§ 416.945(a)(3), 416.946(c), 416.927; *see also Coldiron v. Comm'r of Soc. Sec*., 391 Fed. App'x 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ—not a physician—ultimately determines a Plaintiff's RFC."); *Poe v. Comm'r of Soc. Sec*., 342 Fed. App'x 149, 157 (6th Cir. 2009) ("an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding").  "Hypothetical questions . . . need only incorporate those limitations which the ALJ has accepted as credible."  *Parks v. Soc. Sec. Admin*., 413 Fed. App'x 856, 865 (6th Cir.

2011) (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)). As shown below, the ALJ's RFC and corresponding VE hypothetical are supported by substantial evidence.

### 1. Physical RFC

The ALJ determined that Copfer could perform light work.  Tr. 84.  Copfer submits that the "medical evidence 'proves'" that he is unable to stand and/or walk for six hours of an eight-hour workday.  Doc. 18, p. 20.  In support of this statement, Copfer identifies vocational staff notes reporting Copfer's subjective statements about his ability to stand.  Doc. 18, p.20 (citing Tr. 198, 279, 532).  Copfer also relies on documentation that he had difficulty performing his two-week work trial in a store stocking and cleaning shelves.  Doc. 18, p. 10 (citing Tr. 176, 279, 287-289).

Although one entry indicates that Copfer's employer observed that Copfer had trouble "working down low cleaning shelves for any period of time," it was Copfer who wrote that "long time standing hurts my leg."  Tr. 276.  The ALJ explained that Copfer's statements concerning the intensity, persistence and limiting effects of his symptoms are not fully credible.  Tr. 85.  He observed that Copfer was non-compliant with treatment—compression stockings and pump—in 2008 and early 2009 and that his condition improved after he was counseled to be more compliant.  Tr. 85.  He also described how Copfer's lack of interest in pursuing vocational training and job placement coincided with his efforts to obtain disability benefits.  Tr. 86. Finally, the ALJ pointed out objective medical evidence that Copfer had a normal gait, normal range of motion in his knees, full strength or close to full strength in his legs, appropriate leg function, and that he repeatedly denied having physical pain.  Tr. 85.  Thus, the ALJ's RFC assessment was supported by substantial evidence.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d

469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion.).

Copfer also argues that the ALJ's RFC assessment is erroneous because it does not include restrictions recommended by Dr. Golish based on Copfer's moderate to severe obstructive sleep apnea.  Tr. 18, p. 21.  This argument is groundless.  The ALJ noted that Copfer sleeps using a CPAP machine.  Tr. 85.  Copfer testified that his CPAP machine "works pretty good" (Tr. 29) and in January 2012 Copfer reported that he was sleeping well (Tr. 1163).  The failure of the ALJ to include restrictions based on symptoms that Copfer no longer suffers from is not error.

### 2.  Mental RFC

The ALJ's hypothetical question to the VE described an individual who, while he has twelve years of education, can perform only simple reading, writing and arithmetic, can perform simple, routine tasks in a work setting without frequent changes or fast-paced requirements and involving only superficial social interactions.  Tr. 44.  Copfer asserts that the ALJ's mental RFC assessment minimizes "significant mental limitations demonstrated by objective testing in the record."  Doc. 18, p. 21.  He cites to numerous vocational records in support.  Doc. 18, p. 21-22. He criticizes the ALJ for failing to "evaluate the vocational testing and failed job placement attempts" with vocational services. Doc. 18, p. 22.

First, the ALJ is not required to cite every piece of evidence.  *Peterson v. Comm'r of Soc. Sec.*, 552 Fed. App'x 533, 538 (6th Cir. 2014) (citing *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d241, 245 (6th Cir. 1989)).  Second, Copfer requested that his work trial obtained through vocational services be terminated because of his lymphedema, not because of mental impairments.  Tr. 277, 198.  Indeed, Copfer's employer indicated that Copfer met all standards

and expectations.  Tr. 276.  Moreover, the records detailing "failed job placement attempts" show primarily that potential employers were not hiring and not that Copfer failed because of his mental limitations.  Tr. 269-273.

Third, Copfer does not explain how the ALJ's hypothetical question to the VE describing an individual who can only perform simple reading, writing and arithmetic does not take into account Copfer's limitations in reading, spelling and mathematics or what additional limitation the ALJ should have provided.  Notably, the hypothetical question that Copfer's attorney asked the VE did not include any restrictions regarding reading, writing and arithmetic.  Tr. 46-47.

Fourth, Copfer argues that the ALJ, per SSR 06-03p, was required to consider opinions from "other sources," such as vocational counselors.  Doc. 18, pp. 22-23.  Copfer does not identify what part of the record constitutes an "opinion" by a specific vocational counselor and refers only to "conclusions" by multiple vocational counselors.  Doc. 18, p. 23.  It is not the Court's function to comb through the record on Copfer's behalf and locate an alleged opinion from an unnamed vocational counselor.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir.1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones."); *Meridia Prods. Liab. Litig. v. Abbott Labs*., 2006 WL 1275512 (6th Cir. May 11, 2006).  Moreover, evidence Copfer cites does not support his argument.  *See, e.g.,*  Doc. 18, p. 23-24 (citing Tr. 173 (test results showing Copfer's ability to sustain attention, attend to task, attend to detail, and complete work assignment is "adequate"); Tr. 171 (Copfer's work speed tested in the competitive range); Tr. 779 (medical record based on Copfer's subjective complaints)).

Finally, Copfer contends that the ALJ's RFC assessment limiting him to simple, routine tasks does not adequately account for his moderate limitations in maintaining concentration, persistence or pace.  Doc. 18, pp. 23-24.  Copfer ignores the fact that the ALJ also limited him to a work setting without frequent changes or fast pace requirements and only superficial social interactions.  Tr. 84.  Copfer does not explain how these additional restrictions do not adequately account for his moderate limitations in maintaining concentration, persistence or pace.  Instead, Copfer argues that a restriction that Copfer would be off-task twenty percent of the workday or working at fifty percent speed is required and cites *Johansen v. Barnhart*, 314 F.3d 283 (7th Cir. 2002) in support.  Doc. 18, p. 24.  *Johansen* is not the law in this circuit.  Moreover, the restrictions in the RFC adequately account for Copfer's moderate limitations in maintaining concentration, persistence or pace.  *See Black v. Comm'r of Soc. Sec.*, 2012 WL 4506018, at * 14 (N.D.Ohio Sept. 28, 2012) (RFC limiting claimant to simple, routine and repetitive tasks performed in a work environment free of fast paced production requirements, routine work place changes, and superficial interaction with the public adequately account for moderate limitations in maintaining concentration, persistence or pace).  Substantial evidence supports the ALJ's RFC assessment, and the decision of the Commissioner is affirmed.  *See Jones*, 336 F.3d at 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion.).

### VII. Conclusion and Recommendation

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated: December 5, 2014

Kathleen B. Burke
United States Magistrate Judge

34